Filed 2/9/22  In re F.V. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re F.V., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>E.G.,<br><br>    Defendant and Appellant. | F082919<br><br>(Super. Ct. No. 16CEJ300075-1)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County. Kimberly J. Nystrom-Geist, Judge.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Detjen, J. and Smith, J.

In this juvenile dependency case, E.G. (mother), appeals the juvenile court's order terminating her parental rights to her now 16-year-old daughter, Faith. (Welf. & Inst. Code, § 366.26.)[1] Mother contends the order must be reversed because the juvenile court erred in not applying the beneficial parent-child relationship exception to the termination of her parental rights. (§ 366.26, subd. (c)(1)(B)(i).) We affirm.

## PROCEDURAL AND FACTUAL SUMMARY

*Prior Juvenile Dependency Case*

In March 2016, Faith and her nine-year-old brother, Nicholas, were removed from mother's custody after they attended a Wednesday night Bible study and mother told the church driver who transported them not to bring them back home but to contact child protective services. The church pastor and driver tried to reason with mother but she was insistent that she did not want the children. Law enforcement was contacted and a protective hold was placed on them. The juvenile court adjudged the children dependents and ordered mother and Jerry, the children's father, to participate in parenting, substance abuse, mental health, and domestic violence services. In October 2016, mother successfully completed residential substance abuse treatment and in January 2017 transitioned from sober living. In March 2017, the children were placed with mother and she was provided family maintenance services. In June 2017, the juvenile court dismissed its dependency jurisdiction over them and granted mother sole legal and physical custody.

*Current Dependency Case: Detention*

On May 21, 2020, the Fresno County Department of Social Services (department) received a referral alleging mother neglected the children and physically abused Nicholas. Approximately two weeks before, mother and Nicholas were engaged in an aggressive argument which resulted in Nicholas getting his fingers slammed by the

---

[1] Statutory references are to the Welfare and Institutions Code.

bedroom door. He and mother were arguing over money Nicholas's father gave Nicholas to give to mother. Nicholas refused to give it to her. He was transported to a psychiatric facility and admitted for assessment. (§ 5150, subd. (a).) He said he did not feel safe in mother's custody because she drank one to two bottles of Fireball a day.

Mother explained she was trying to prevent Nicholas from leaving home when she closed her bedroom door to stop him and his fingers accidentally got caught in the door. She took him to the hospital and he was treated. The argument over the money occurred two weeks later. She had picked Faith and Nicholas up from their father's house. The father wanted to pay mother for her gas but did not have a small bill so he asked Nicholas to give her a $20 bill. Nicholas refused to give her the money and started to " 'mouth off.' " Back at the house, it escalated into a physical altercation. Nicholas head-butted her, bit her fingers, bit her under her arm and called her a " 'b****.' " The police took Nicholas to a psychiatric facility where he stayed for a day and a half. Afterward, he was referred for mental health therapy and seemed to be doing better.

Mother denied drinking alcohol, but admitted drinking wine occasionally a " 'long while ago.' " Asked when she last drank wine, she said the week before when Nicholas head-butted her, giving her a headache. She could not remember when she drank wine before that. She admitted drinking a small amount of Fireball occasionally when the children were settled in for the night. She denied using drugs.

Nicholas said he felt safe at home with mother. They had worked out their differences and agreed each to go to their " 'quiet space' " in the home to calm down when there was tension.

Faith said mother was drinking a lot, almost every day, and when she drank she got mad and yelled for no reason. The stress of mother's drinking caused her to grind her teeth and make her jaw hurt. She did not know what to do anymore and wanted to live with her maternal aunt or her adult sister.

3.

The department offered to develop a safety plan with mother where the children would stay with their maternal aunt but mother vehemently rejected that idea, stating she would rather they were placed in foster care.

The department filed a dependency petition, alleging the children came within the juvenile court's jurisdiction under section 300, subdivision (b)(1) (failure to protect) because of mother's alcohol abuse and Nicholas under subdivision (c) (serious emotional damage) because he and mother engaged in physical and verbal altercations, which caused him to suffer from depression and necessitated his involuntary hospitalization.

The juvenile court ordered the children detained pursuant to the petition and offered mother random drug testing. The court set a jurisdictional/dispositional hearing (combined hearing) for July 16, 2020. The children were placed with their maternal aunt.

*Disposition*

The department recommended the juvenile court sustain the allegations and deny the parents reunification services. (§ 361.5, subd. (b)(10) & (13).) The department was concerned mother would continue to abuse alcohol while caring for the children and engage Nicholas in physical and verbal altercations. It considered father's prognosis for reunifying slim given his prior failure to reunify and denial that he had a substance abuse problem.

On October 9, 2020, following a contested combined hearing, the juvenile court denied the parents reunification services as recommended and set a section 366.26 hearing for February 4, 2021. Mother filed a notice of intent to file a writ petition and writ proceedings were initiated in our case No. F081882. However, mother did not file a writ petition and her case was dismissed as abandoned.

*Contested Section 366.26 Hearing*

The department recommended the juvenile court find that Faith was adoptable and terminate parental rights. Faith wanted to remain with her aunt and be adopted by her. She had known her since birth and was comfortable in her care. Faith got along well with

4.

her cousins whom she considered her siblings. She had made significant progress while in her aunt's care, which her aunt attributed to the love and consistency she provided her. Since it was unlikely Nicholas could be adopted or placed in legal guardianship, the department recommended he remain in foster care with a relative.

In deciding that adoption was the optimal permanent plan for Faith, the department assessed the strength of Faith's bond to her parents and caretaker by analyzing four specific areas: structure, nurturing, challenge, and engagement. According to the department, mother did not appear to take on a parental role and provide Faith structure and was not emotionally nurturing. Though she took pleasure in Faith's accomplishments, she did not set tasks for Faith to accomplish and Faith reported that mother did not positively engage with her. The department also determined that Faith needed stability and continuity in her life. Faith's maternal aunt cared for Faith as if she were her own daughter and wanted to adopt her. She was willing, however, to be Faith's legal guardian if Faith did not want to sever her relationship with mother.

On February 4, 2021, the section 366.26 hearing was continued to February 11 to allow mother time to review the department's report. Mother agreed to the recommendation regarding Nicholas but wanted a contested hearing as to Faith. On February 11, the court ordered Nicholas into long-term foster care and set a contested 366.26 hearing as to Faith for April 29.

Meanwhile, in March 2021, an investigator for Fresno Child Advocates met with Faith at her maternal aunt's home to determine whether Faith understood what adoption was and whether she wanted to be adopted. Faith wanted her aunt to adopt her and understood that her aunt and uncle would be her parents if she were adopted. She got along with the family and felt loved and wanted by them. She wanted to maintain contact with Nicholas and mother after being adopted. Her maternal aunt was supportive of any decision she made. She was doing well in school, taking advanced placement classes so she could graduate with her class. She completed a mental health assessment and was

scheduled to begin therapy later in the month. She enjoyed living with her aunt and felt safe. The family went on day trips to the beach and foothills, went out to eat, played board games and watched television together.

On April 29, 2021, father appeared, was appointed counsel, and asked to participate in a contested hearing. He believed Faith wanted to return to his custody and objected to the termination of his parental rights. The court continued the contested 366.26 hearing to May 25, 2021.

On May 25, 2021, Faith testified she wanted to be adopted. She understood that if she were adopted her biological parents would no longer be her legal parents and her aunt had the right not to allow her to see her parents again. After adoption, she would no longer be involved with the court. She understood legal guardianship to mean that the court would still be involved. She still preferred adoption even if a legal guardianship could be arranged with her aunt without court involvement. She stated, "I'm just doing really, really good right now. I like the environment I'm in." No one had influenced or pressured her to choose adoption over guardianship. She had given her decision a lot of thought.

Faith did not have a bad relationship with mother but there were good days and bad days when mother acted out and called her names. On good days, mother had breakfast ready in the morning. They went out to eat or stayed home. However, on bad days, mother would get very angry or may be under the influence and would yell. She had a normal sibling relationship with Nicholas. She did not have any contact with him because he had run away. She missed him a little, explaining he was making bad choices and lying a lot. She did not want to be exposed to his behavior.

Visitation with mother had been via video or by telephone since the beginning of the case, partly because of the pandemic and partly because she was not mentally prepared to visit mother in person. She was considering in-person visitation but was

uncertain if she wanted that to happen. She was concerned that if she was in mother's presence, mother may say something to offend her and she would not know what to do.

Mother was sworn and allowed to address the juvenile court. She believed it was unfair that Faith could make the decision to be adopted because it would take Faith away from her completely. She raised Faith and played a large role in her life. Faith had done well because of mother and they were close. She did not believe Faith understood the implications of her choice. Father's attorney conveyed father's love for Faith and his support for her decision. He hoped to maintain a relationship with her and be a part of her life.

Mother's attorney asked the juvenile court not to order adoption as the permanent plan but to select legal guardianship instead. She did not argue that any of the exceptions to adoption applied.

The juvenile court found that Faith was likely to be adopted and terminated parental rights. The court addressed the bond between Faith and her parents and Faith and her aunt by summarizing the categories of structure, nurturing, talent, and engagement, noting that the evidence favored the aunt. The court advised the parents of their appellate rights and set a postpermanency review hearing for November 10, 2021.

## DISCUSSION

Mother contends the juvenile court erred in terminating her parental rights rather than properly considering and applying the beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(B)(i) pursuant to the guidelines set forth by the Supreme Court in *In re Caden C*. (2021) 11 Cal.5th 614 (*Caden C*.).) We disagree.

*Beneficial Parent-Child Relationship Exception to Adoption*

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship

exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)

To establish the beneficial parent-child relationship exception, the parent must show by a preponderance of the evidence three elements: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child. (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 636.) In assessing whether termination would be detrimental, the juvenile court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at pp. 631–632.) When the parent meets this burden, the exception applies such that it would not be in the child's best interest to terminate parental rights and the court selects a permanent plan other than adoption. (*Id.* at pp. 636–637.)

The first element of the exception asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid.*)

The second element asks whether "the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 629.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The juvenile court's focus should again be

8.

on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, *supra*, at p. 632.) "[T]he parent must show that the child has a substantial, positive, emotional attachment to the parent— the kind of attachment implying that the child would benefit from continuing the relationship." (*Id*. at p. 636.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court is guided by the child's best interest in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid*.) " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Ibid*.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id*. at pp. 633–634.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id*. at p. 634.)

We review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id*. at pp. 639–640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even when substantial evidence to the contrary also exists. (*Id*. at p. 640.) The juvenile

9.

court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion. (*Ibid*.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

*Mother Forfeited Her Contention the Beneficial Parent-Child Relationship Exception to Adoption Applied*

The failure to raise the beneficial parent-child relationship exception in the juvenile court forfeits it as an issue on appeal. (See *In re Rachel M*. (2003) 113 Cal.App.4th 1289, 1295 [relative caregiver exception; "[t]he juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies"]; see also *In re Daisy D*. (2006) 144 Cal.App.4th 287, 292 [same, with regard to the beneficial sibling relationship exception].)

Here, mother's counsel did not argue at the section 366.26 hearing that the beneficial parent-child relationship exception to termination of parental rights applied. Her attorney simply argued for legal guardianship instead of adoption as the permanent plan. Therefore, mother forfeited her contention.

Nevertheless, even assuming the issue was not forfeited, we conclude the juvenile court did not err in rejecting the beneficial parent-child relationship exception. The exception clearly did not apply on the facts of the present case, and the juvenile court's finding would be upheld under any standard of review.

In the present case, the evidence supports a finding mother had regular visitation and contact with Faith. The question would be whether mother demonstrated Faith had a "substantial, positive emotional attachment" to her such that Faith would benefit from continuing the relationship. Mother contends she clearly met her burden on that issue because Faith wanted to continue to enjoy her relationship with her. The record, however, does not support mother's contentions. Faith was not asked whether she wanted to continue her relationship with mother or what kind of relationship if any she

10.

wanted to have with mother. She was, however, asked and was very clear that she wanted to be adopted and understood that adoption may mean she would not have any contact with mother. Her willingness to sever all ties with mother indicates she did not have a substantial, positive emotional attachment to mother such that maintaining the parent-child relationship would benefit her. That same evidence answers the ultimate question: i.e., whether Faith's relationship with mother was so important to her that the detriment to her of losing that relationship outweighed the security and stability of a new home with her maternal aunt. For Faith, the benefits of adoption outweighed any detriment she might suffer from the termination of mother's parental rights. She so poignantly stated, "I'm just doing really, really good right now. I like the environment I'm in."

## DISPOSITION

The juvenile court's order terminating parental rights is affirmed.